Alright, I think we are ready for our second case for the day, which is Sheets v. Interra Credit Union. Mr. O'Leary. Good morning, may it please the Court. Jack Sheets brought two claims against Interra Credit Union under the Americans with Disabilities Act. The first claim is the breach of confidentiality. This case appears to be the first of its kind involving a disclosure by an independent contractor. That contractor was Kurt Beckler. Mr. Beckler, who sometimes is referred to as Dr. Beckler, has a Ph.D. in communications. So this case is different than Blanco v. Bath-Ironworths, in which the disclosure was committed by a doctor who was an in-house salaried physician. This is an independent contractor, and we say that it doesn't matter because the duty under the ADA in terms of confidentiality is non-delegable, and therefore while Interra could delegate the performance of the duty, it could not delegate the ultimate liability. So Mr. Sheets, as I understand it, your argument is that when the Board asked for updates on his planned return and for those to be communicated through Mr. Beckler, it was actually asking for confidential medical information, but I think that's kind of a leap. It seems to me it would be quite easy to update on planned return, saying things like, you know, my doctor thinks I'm going to be ready to come back to work in six weeks or whatever, I'm just making up something. But it seems to me it would be quite easy to do that without delving into the medical record, and if that's the case, then the district judge's sense that it was really Mr. Sheets' voluntary disclosure that had gone on makes sense. You can't take it out of context, Judge Wood. You know, this is the CEO of a large credit union, a man who has been delegated an enormous amount of responsibility, and you can tell by reading the letters that the chairman wrote to Jack. The credit union was extremely concerned that Jack would attempt to return to work before his recovery was complete. You can see that plainly in the letters, and it was Interra that initiated the request for information by first sending Jack the FMLA forms. Well, what was wrong with sending FMLA forms if he wants FMLA leave? Well, that's interesting because he didn't, and that's the point. You'll notice in one of the board minutes, the vice president came to the board meeting and said, Jack won't, we sent him the paperwork and Jack won't sign it. And the clear inference is that the credit union on its own initiated that, concerned that he would try to come back. But nothing leaked from the FMLA paperwork anyway. The board made that request directly. No, that's true, but as the court said in Thrivant, the district court opinion, it's the party that initiates the request for medical information, and that initiation began with the request for the FMLA paperwork. Then there's the letter of February the 26th, which is very clear. In that letter, Chairman Warner admonishes Jack, says you are not to be working. Don't try to do work on your own time. We want communication with you. We want status reports on your leave, and we've assigned this task to Kurt Beckler. Right, and that's where I'm having trouble seeing that as a request for the medical file, as opposed to when he's likely to return and things that are of a more general nature. Well, I think it's the same thing. But it doesn't have to be. It doesn't have to be, but I think in this context it was. They did not want him returning until he was cleared medically. So they wanted to know about his medical recovery. And so when he tells Beckler, one of my treating doctors has a problem with my medical flexibility, he is complying with the interrogation directive. At least that's an issue of fact in this case, Judge, and we're here on a summary judgment. So I would remind the court that, and I don't need to remind you of anything. You don't need to remind us of that, actually, so don't worry about it. We will look, as we say de novo, it's not really de novo review, we will look at the record and see whether there is enough for this claim of disclosure of confidential information. Well, here's another, and I think it would be useful to discuss, I think,  and that was after telling Jack that he had to provide timely reports, and after Jack sent the email to Beckler saying, I have a problem with mental flexibility, Jack suggested another thing. He said to Beckler, hey, wouldn't it be great if you could be my advocate with my doctors and be my intermediary? And Beckler said, no, I can't. There's a conflict of interest. I'm in Tara's liaison. But then Beckler came back to him and said, here's a medical release. This was April the 27th, and I think he declined to be his intermediary around April the 20th. So here Beckler comes back and says, hey, we have a plan to monitor your medical flexibility. Here's a medical authorization that will allow me to talk directly to Dr. Rohr. And based on that authorization, he meets with Dr. Rohr. Wasn't there language in that that indicated he was waiving any right to object to Beckler passing that information along to third parties? Well, there was some language. I don't recall the precise language. But to say that that can override a federal statute that imposes. The federal statute allows you to waive the right. That's the thing. It's not something that's unwaivable. Before your time is out, I want to ask you about the discrimination claim too. Because what I'm struggling with is even if we assume that Mr. Sheets was perceived as having a disability, and even if we assume favorably to you that he could perform all the essential functions of his job, I'm having trouble with causation. Because reading your opponent's brief, it seems that from a time long before his medical incident, his hemorrhage, there's tension with the top management group. Maybe not with the whole set of people who work for Interra, but there's tension. And so if that's there before, then this venture company comes in, works with him, he gets a little better, and then they say, well, actually, he's backsliding by October and by January of the next year. They say, we've had it, and they try to work with him for a smooth departure. That doesn't work, and so they just fire him. Why does his perceived disability have anything to do with that act of letting him go? Two reasons, Judge. We have suspicious timing, and I'll get to that in a second. And we have the words themselves. The timing is suspicious because you have to, again, in context, Jack was president for 26 years, and you've got a sense of how successful he was in that role. The growth of this little credit union with five employees and 4,000 members, up to 55,000 members, half a billion dollars in assets. Obviously, he doesn't take full credit for that, but he was at the controls. And there was some tension, as you call it, but let's be fair and identify what it was. There was a handful of complaints, three. But I gathered that some of the top management people are the ones who are regularly complaining to the board. Isn't that right? Well, I disagree because we have the board minutes. We don't need to speculate what they were thinking. We have the board minutes of December of 2010, the month before he had his hemorrhage. There is nothing in those minutes indicating the type of negativity that the appellee has suggested in this case. In fact, if you look at that board minute of December of 2010, Judge Wood, you'll notice they're talking about doing an evaluation six months down the road in July of 2011. That is not the language of a board of directors intent on terminating a president. That's inconsistent, and that's our case in that regard, is that there's nothing in the record contemporaneously indicating that level of dissatisfaction. Was he perfect? Of course not. He had room for improvement, and by all accounts, he met those expectations. But look at the timeline. It's very interesting, isn't it? He comes back in August of 2011. He's restored. He's gone through executive coaching. His coach praises him highly. He has an evaluation in April of 2012. Excellent and outstanding. He gets a $25,000 raise. Between April of 12 and August the 17th of 12, there's nothing negative about him, and then in a board meeting on April the 17th, the board gives him White Sox tickets. That's inconsistent with, again, the level of negativity that the appellee is suggesting. You don't give someone White Sox tickets and make no negative comments about them, and then four months later, you're talking about his inability to focus. Focus, focus, focus. I think that works against you on causation here. There's a two-year time gap between the time of his brain hemorrhage and the perception on the part of the credit union that he's got cognitive impairments and the termination decision. So the timing is not at all suspicious. They worked with him for two years to address the preexisting leadership deficits that had been noted and, in fact, prompted the bringing in of this outside consultant, which all occurred before he suffered his illness. He suffered his hemorrhage in January of 2011, returned in August, went through executive coaching, had his evaluation, was given the raise, given the White Sox tickets, and then the next day. Venture was brought in to work with him on his managerial problems in 2007. So they've been on the scene for a long time. You know, the fact that the credit union worked with him for that duration of time suggests that his termination was based on the longstanding problems with his leadership style and leadership abilities rather than. But Judge Sykes, you know, that same company in their report on that 2007 evaluation called Jack Sheets a visionary, knowledgeable, greatly respected within the industry. Right. Well, you know, maybe they overemphasized the deficits, but that's not the issue on an ADA claim. The claim is whether he was fired because of the perceived disability. And there's just no evidence of that here. The causation evidence is. . . I feel that I'm eating into my rebuttal. I'm going to press forward on this point. I think you have. . . It's a very interesting case. You have a consultant who wants to stay on board and understands that Jack is the party that has ended that and who then lobbies to stay on board. First in a report to the board where he talks about Jack has cognitive recovery and so forth. Then he sends the email to Berkey, and you can see he's talking about we're ending our relationship, but you need to know that he has a cognitive injury. Venture leaves the scene in July of 2012. A month later, Berkey makes his call to an anonymous hotline and who fields the call but Beckler. Beckler fields the call and then reports the call anonymously to Interra. That compliance call, Judge Seid, is still being discussed in the board meeting of December of 2012. A month before they vote to remove him, they're still talking about that compliance hotline call, among other things. If you look at that December board meeting and you look at the January decision, what are they talking about? Lack of focus. Three of the board members mentioned focus. Warner, Bruton, and Esch. A fourth board member is David Myers. David Myers testified under oath that as far as he could recall, the only thing he remembered that was given to the board at that time was negative information from David Berkey, the compliance call. Now that's significant because we know that's erroneous. There were other things, but that's the only thing Myers could recall. I say there are four board members, based on this record, that base their decision on the compliance call accusation. Well, if you'd like to save your last minute, I will let you do that. Thank you. Mr. Lund. Thank you, Your Honor. May it please the court. My name is Jeffrey Lund on behalf of the appellee in this case in Terra Credit Union. With all due respect to Mr. O'Leary in this case and Mr. Sheets, we do believe the EEOC, or excuse me, we do believe that the district court did get it right. Mr. O'Leary talked briefly about the disclosure claim, and he mentioned the EEOC versus Thriven decision. And we believe that's on point for a variety of reasons. In that case, the EEOC took the position that the email from the employer to the employee when he did not show up for work on time was, what's your status, what's going on? That type of email was a medical inquiry as to his ability to perform job-related functions. And when he responded to that with respect to having a headache, a migraine related to a motor vehicle accident, and that was subsequently disclosed, the EEOC took the position that the word inquiry, as defined in the ADA, applies to any inquiry, any job-related inquiry. And this court said, no, it does not. It relates to medical inquiries into the person's ability to perform the job-related functions. And Mr. Sheets has taken the same leap in this case. This is a letter from February of 2011 from the board asking him, or telling him, excuse me, Mr. Sheets, that we have assigned Mr. Beckler as our liaison to keep us apprised of the status of your leave. Appraisals and inquiries into the status of a leave are wholly contemplated and allowed under the interpretive regulations in the CFR under the ADA. We cite to that in our brief, 29.825.311. An employer is entitled to ask, what's the status of your leave? Do you need more time on leave? Do you need a shorter leave? Can you come back sooner? And that is the nature of this request. But Mr. Sheets does not, or Mr. Larry did not talk about the fact that, what's the context of this request? The context of this request was that Mr. Sheets was the president and was the CEO. Not only was he subject to the FMLA policy, he was aware of it, and he had a hand in creating it, and he did not comply with it. The board, several times during his hospitalization, asked, we need FMLA certification, and he refused. Not once, not twice, repeatedly. In his deposition, he admitted to that. He admitted, I was exercising my medical disobedience, my rights to medical disobedience, so that is the context, and that is the purpose of that letter. Now, after Mr. Beckler is appointed as the liaison, before he has any communications with Mr. Sheets, what does Mr. Sheets do? He sends him an email, unrequested by Mr. Beckler, providing him with an authorization to get his medical records, providing a form called HIPAA request, my request for your inquiry, and providing information regarding his diagnosis with mental flexibility issues, being treated similar to a stroke victim, having visual inattention issues, and a variety of other medical conditions. All this was volunteered by Mr. Sheets to Mr. Beckler. There can be no dispute that Mr. Sheets volunteered this information to Interra through Mr. Beckler. So when the information, even if you're right and summary judgment was correctly granted on the medical disclosure issue, it certainly tells us that Beckler passes along to Berkey, who seems to have had a very dim view of Mr. Sheets, as far as I can tell from this record, passes along this medical information, which Berkey then, a jury could think, immediately acts on by poisoning the board and leading pretty directly to Sheets' firing. So, I mean, all of this is, you know, focus, and you could think that those were synonyms for cognitive problems. It wasn't just that he was, you know, uninterested. He just didn't have the ability to focus, one might think. So why, even if it was correct to throw out the medical records point, isn't there a jury question on the discrimination point? Your Honor, one might think that, but I think if you take the context of all the evidence, which is what we do now, which was made clear by this Court in the Ortiz decision issued on August 19th of 2016, we look at all the evidence and the threshold, or the question is, will that evidence, could a reasonable fact finder infer that, in this case, Mr. Sheets was terminated because of his perceived disability? And to answer your question, Judge, in a vacuum I think that's an appropriate analysis. But here, let's look into what was occurring beforehand. But we can't weigh evidence. I mean, the jury might have thought that what had happened beforehand had been forgiven by the time he really seems to be finally taking the lessons in April, and he gets the raise, and people are saying, gee, you know, he's really making great progress with the coaching, his manner has improved, or whatever else, saying a lot of positive things at that point. Understood, Your Honor. And during that time period, I think the record is clear, and Tara was spending an upward in excess of $100,000 on crisis management, crisis intervention. Yeah, they're having him coached with this company Venture. Yeah, we're having him coached. He has people there on a daily basis. All the SMT, which is our senior management team, that team of which Mr. Berkey was a part, there is a liaison, there is a Beckler-type representative from Venture within those meetings. All of that was happening during this improvement that Mr. O'Leary talked about. During the somewhat improved evaluation in April of 2012. During the raise, which I think we've addressed that issue in our brief. But nobody has to believe that is the reason for the raise. Oh, we just decided to be an industry median. I mean, you don't give people raises that you're not happy with. Understood, Your Honor. Who would care if you were below the median? Only Mr. Sheets, probably. True. It's a valid point. And, Your Honor, I simply mean that during the course of this process, Venture is involved and they're in the mix. And Venture leaves at the summer. And what the Board saw was reemergence of issues that had existed well in advance of Venture's involvement and well in advance of Mr. Sheets' hemorrhage. We have a long history of Mr. Sheets in an organizational assessment in 2007. Now, Mr. O'Leary has indicated there was no mention of focus prior to the hemorrhage. And that's simply not the case. The record doesn't support it. The record is clear. In 2007, Venture was brought in because Interra was in a crisis mode. Well, they're brought in. But what he points out is that their report at that time is, you know, Mr. Sheets has pluses and Mr. Sheets has minuses. Other people have pluses. They have minuses, too. The company has been very successful. I mean, it really is a story of excellent growth of a company. So why couldn't a jury wonder whether Mr. Sheets was really all that terrible as president? Your Honor, I don't believe that under the ADA discrimination charge, the termination charge that we're looking at, the evidence we do not believe points directly to it. That is what his burden of proof is, to show it's the but for a cause. And we have unrebutted, as the district court appropriately found, I think, with respect to at least the essential functions analysis, of which the court granted summary judgment on the second prong of that analysis. There is unrebutted evidence with respect to why the board did what it did. Mr. Sheets was obligated to sign a shared commitment set at the record of 49-37. When he came back on, because of preexisting issues, you saw his failure to complete the goals and objectives that were set forth for him in April of 2012. You saw a disengagement between Mr. Sheets and his senior management team, which was one of his goals and objectives, mind you. And we saw that at the retreat in September of 2012. And maybe most telling of all, in December of 2012, Mr. O'Leary pointed that there's nothing in that record and those executive minutes that would show that the board had any reason to do what it did. Mr. Sheets came into that meeting, and after executive session, he admits to the board that camaraderie and communication among and between himself and the SMT had not improved at all, and that was too much discernment to him. And that was one of the major goals and objectives. Historically, that was an issue. In 2007, when we did an assessment, he was a poor communicator. He lacked a focus in the sense that he did not run good meetings. These were still recurring issues. Judge Sykes raised a point in Mr. O'Leary's argument that I think is one that we articulated as well in our brief. What Mr. Sheets is asking this court to do is to make the illogical leap, the illogical leap in our opinion, that the same board that hired Venture in 2007 to come in and do an assessment, the same board that when Mr. Sheets admittedly and openly refused and violated our FMLA policy allowed him to stay employed, the same board that allowed Mr. Sheets to have a general leave of absence after his FMLA leave expired, who gave him a raise in April 2012, who gave him White Sox tickets. As a Tigers fan, that's difficult for me to hear, but even the case. All of these things that this board did, and then all of a sudden, within a couple of months, develop a discriminatory animus because of a perceived disability. That just does not make any sense. We believe that evidence taken as a whole, and looking at it in a straightforward way as is required in Ortiz, demonstrates that the board did not have discriminatory animus here. The board did work with Mr. Sheets for a two-year period of time, and that's one of the things that the other board members. Remind you, this was a decision of seven in January of 2013. It was a decision of six in March because one recused himself without not having information, but the ultimate decision, which began the process, was a decision of seven. He's pointed to three, Mr. Warner, Ms. Bruton, and Mr. Ashton. There's no dispute they used the term focus, and they have testified unrebuttably what they believe and what they meant by focus. Focus, issues that preexisted 2011, but there are four other members. Now, Mr. Myers was brought up by Mr. O'Leary in his argument, and what Mr. O'Leary said was that, well, Mr. Myers testified in his deposition that he can only remember negative things that Mr. Berkey raised. What Mr. O'Leary is ignoring, and what the district court, Judge DeGuglia, found and mentioned in his opinion was, but that ignores the fact that there were things that the board themselves saw, the disengagement at retreat, the failure to provide goals and objectives. And Mr. Myers mentioned those things, and his words were, we don't have the right people on the bus. Mr. Rupp, another board member, said at that meeting that he felt like we were spending too much money on professional fees, as did Mr. Weaver, and that... Consultants like to make themselves indispensable, I might point out. I don't dispute that. But Mr. Rupp also said that he had disappointment in Mr. Sheets' performance at the retreat, and he was disappointed in the way that there was interaction. And Mr. Warner and Ms. Brewton and Mr. Esch said similar things. He's taken these things out. So we believe the overwhelming evidence in this case would not allow a reasonable fact finder to infer that there was any discriminatory animus. Additionally, I think I would be remiss not to address one last issue, if the court would so allow, and that is the essential functions portion of it. And Judge DeGuglio issued summary judgment on that issue alone, as far as the termination claim goes. And we believe that the court was correct in doing so. Mr. Sheets must be able to perform the essential functions of the job. He's not asked for reasonable accommodation. And one would argue that he's not entitled to one anyways under the regarded as prong, which is the only definitional element that he's pursuing this case under. I think 12201 subsection H indicates that that may not be available or is not available to individuals pursuing it. But putting that aside, Judge DeGuglio pointed out a litany of things that shows that Mr. Sheets was not qualified and could not perform the essential functions of the job at the time of his termination, and that was key. Because Mr. O'Leary in his brief, and rightfully so, talked about the things and the improvements that Mr. Sheets had made under the tutelage of venture, which I've talked about in my argument today. But at the time of the termination, we must focus then, what was he doing in January of 2013? This was on the heels of his failure to provide any documentary evidence to support his completion of goals and objectives that were given to him in April of 2012. Mr. Sheets himself, and this is in the record, sent an email to Mr. Warner, the board chairperson, who said, Steve, you're not going to find any materials in response to items 5, 6, and 7. Goals and objectives 5, 6, and 7. That's Mr. Sheets' own admission. It's a telling admission with respect to what the board was dealing with at the time that they made the decision to terminate his employment. And we believe that's the key analysis. So I'm into my last minute, and I would just like to close saying, for all the reasons that we've discussed, we would respect the request that the summary judgment issued on behalf of my client on both the disclosure claim and the termination claim be affirmed. Thank you. All right, thank you. I think you have one last minute, Mr. O'Leary. Thank you, Judge. Why did Interra act the way that it did? It acted the way it did because it had an interest in Mr. Sheets coming back to work. If you look at the report that Beckler authored in April of 2012, I think the opening sentence in that report is, the credit union suffered immense trauma by the unexpected illness of its CEO. And that's a compliment. In the same report, he says that Mr. Sheets successfully transitioned back to the CEO-president position. So what changed? Well, what changed was someone in the trenches, David Berkey, fed that concern that he might have a cognitive impairment. And if you look at his compliance hotline transcript, he used his focus. He says that Jack can't understand. He has trouble understanding multiple voices around the table. He asks too many questions. He's constantly asking questions. And then Beckler, fielding that call in a breathtaking plan of cleverness, then reports that to the board. And it's a nine-point memo. You don't give a nine-point memo except when it's a five-alarm fire. And anyway. Okay. Well, thank you very much. I think we have your point. We will take the case under advisement.